RAYMOND I. BASHFORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71565.  Promulgated September 10, 1935.

*Walter G. Moyle, Esq., Stanley Suydam, Esq.,* and *Earl B. Breeding, Esq.,* for the petitioner.
*W. Frank Gibbs, Esq.,* for the respondent.

OPINION.

SMITH: This case involves a deficiency in income tax of $35,941.63 for the calendar year 1930, and depends for its solution upon the question of whether there was a reorganization of three corporations into one, and whether another corporation, the Atlas Powder Co., which was not reorganized, was a party to the reorganization.

The evidence consists of a stipulation of facts, including a number of exhibits, and the oral testimony of two witnesses.

Prior to October 7, 1930, the Peerless Explosives Co. was a Delaware corporation, engaged in the manufacture and sale of explosives. There were issued and outstanding on October 7, 1930, 17,672 shares of preferred stock of a par value of $25 per share and 14,890 shares of common stock of no par value. On the same date petitioner was the owner of 2,541 shares of common stock of the Peerless Explosives Co. and 28 shares of its preferred stock. This company will hereinafter be referred to as Peerless.

On and prior to October 7, 1930, the Union Explosives Co. was a West Virginia corporation, engaged in the manufacture and sale of explosives. It had outstanding 3,367½ shares of preferred stock of a

par value of $100 per share and 4,044 shares of common of no par value. This corporation will be referred to hereinafter as Union.

At the same time the Black Diamond Powder Co. was a corporation organized and existing under the laws of Pennsylvania, with an issue of 1,584 shares of common stock of the par value of $100 per share, all of which was owned by Peerless. This company will be referred to hereinafter as Black Diamond. It was engaged in the powder business.

On and prior to October 7, 1930, the Atlas Powder Co. was a corporation organized and existing under the laws of Delaware, engaged in the business of manufacturing and selling high explosives and related products. On October 7, 1930, there were issued and outstanding 261,438¾ shares of common stock of no par value, including treasury stock, and 96,318 shares of preferred stock of $100 par value. Hereinafter this company will be referred to as Atlas.

On or about September 22, 1930, the Peerless-Union Explosives Corporation was organized under the laws of Delaware, and on or about October 6, 1930, its capital stock was increased from 500 shares of preferred stock of $100 par value and 500 shares of common stock without par value, to 50,000 shares of preferred stock of $100 par value and 100,000 shares of common stock of no par value. Hereinafter this company will be referred to as the new company.

Peerless, Union and Black Diamond were all engaged in the same general line of manufacture and sale of high explosive as was Atlas. Peerless, Union and Black Diamond were at the same time business competitors and customers of Atlas, since they purchased large quantities of chemicals used in the manufacture of their products from Atlas.

The situation of rivalry was not satisfactory to Atlas, which desired to remove the possible dangerous competition and to acquire for itself the business of these competitors. Early in 1930 Leland Lyon, president of Atlas, conceived the idea of reorganizing Peerless, Union and Black Diamond, and consolidating or merging them into a new company, which would be controlled by Atlas.

It was desired that the identity of Atlas in the transactions should not be known at the inception of the negotiations, so Lyon summoned to his office at Wilmington, Delaware, H. J. Seligman and W. E. Fletcher for consultation and formation of a plan of action. Both of these men were experienced in the powder business and had formerly been connected with Atlas, and were personally acquainted with many of the stockholders of Peerless and Union. It was for these reasons that they were selected by Atlas to conduct the preliminary negotiations. They were instructed that Atlas did not desire to purchase either the assets or stocks of Peerless, Union or Black Diamond, but to reorganize them into a new company by the

exchange of stocks, which new company would be controlled by Atlas. It was desired that the stockholders of the old companies should go along with them into the new.

The preliminary negotiations with the majority stockholders of Peerless and Union were conducted by Atlas through its agents, H. J. Seligman and W. E. Fletcher, without disclosing the identity of Atlas until it had secured from said stockholders their oral assurances that they would exchange their stock in Peerless and Union substantially on the basis of the written contracts finally entered into conditionally on the ability of Seligman and Fletcher to secure the participation in the plan of substantially all of the remaining stockholders through option agreements. It was made plain from the beginning, however, that a strong financial interest was represented and would participate in the plan to the extent of furnishing necessary funds, and that Seligman and Fletcher and the principal stockholders of Peerless and Union would be officers in the new company.

Omitting unnecessary details, the main features of the plan were that Peerless, Union and Black Diamond were to be consolidated into the new company, Peerless-Union Explosives Corporation, that the stockholders of the old companies would receive for their stock in the old companies stock in the new company, stock in Atlas and some cash. Atlas on its part was to furnish the new company with sufficient cash and sufficient shares of its own common and preferred stock to complete the transaction. In return it was to receive sufficient common and preferred stock in the new company to assure its control.

As a preliminary step in the proceedings Atlas caused the incorporation of the new company under the laws of Delaware on September 22, 1930, for the purpose of acquiring the business and assets of Peerless, Union and Black Diamond, and subscribed to all of its original issue of common and preferred stock, being 10 shares of common and 10 shares of preferred, for which it paid $1,001, of which $1,000 was for the preferred stock and $1 for the common stock. This stock was all issued to Atlas. Subsequently, on October 6, 1930, the capital stock of the new company was increased to 100,000 shares of common of no par value, and 50,000 shares of preferred of $100 par value.

On October 2, 1930, a special meeting of the board of directors of Atlas was held and upon motions duly adopted the actions of its executive officers in causing the formation of the new company for the purpose of acquiring the assets and business of Peerless, Union and Black Diamond, and the plan of reorganization were approved. The officers of Atlas were empowered and directed to invest in the capital stock of the new company up to an aggregate of 21,732 shares of the 6 percent cumulative preferred stock of the new company and

32,198 shares of its common stock, and in consideration therefor to deliver to the new company $960,560.25 in cash, 6,318 shares of Atlas preferred stock on the basis of $100 per share, and 8,712½ shares of Atlas common stock on a basis of $66.66⅔ per share.

On October 7, 1930, the petitioner, Bashford, E. Frost of Philadelphia, and Edward R. Day of White Haven, Pennsylvania, as majority stockholders of Peerless, parties of the first part, and H. K. Seligman, and W. E. Fletcher, as promoters, parties of the second part, entered into a written contract by which the stockholders warranted, among other things, that they owned or controlled 8,500 shares of the common stock of Peerless. On their part the promoters warranted that the new company was a corporation organized under the laws of Delaware for the purpose of acquiring the assets of Peerless, Union and Black Diamond, subject to their several liabilities in accordance with the plan of reorganization. They further warranted that upon the acquisition of the assets of Peerless, Union and Black Diamond, the new company would have a working capital of at least $300,000, and an authorized capital of 150,000 shares represented by 50,000 shares of 6 percent cumulative preferred stock of the par value of $100 each and 100,000 shares of common stock of no par value, of which there would be outstanding 21,732 shares of preferred stock and 65,000 shares of common stock. The common stock carried voting rights, but the preferred stock could be voted only in case of default on the dividends.

Promoters further agreed that they would take such action as was necessary to liquidate Peerless, Union and Black Diamond, and transfer their assets to the new company. It was thereupon agreed that the stockholders should deliver to the promoters their 8,500 shares of common stock of Peerless in exchange for 9,000 shares of common stock of the new company, $125,000 cash, 2,225 shares of the cumulative preferred stock of Atlas, which should be accepted at the par value thereof and 3,712½ shares of common stock of Atlas, which should be accepted at a price of $66.66⅔ per share.

As additional consideration for the exchange, the promoters agreed to cause the new company to reimburse the stockholders for any Federal income tax paid by them because of the transaction.

It was further agreed that the promoters would use their best efforts to exchange the outstanding preferred stock of Peerless, viz., 17,672 shares of the par value of $25 each for the sum of $25 each and an amount of common stock in the new company not to exceed 4,000 shares, and that they would use their best efforts to exchange the 6,390 shares of outstanding minority common stock of Peerless upon the basis of a one-half share of common stock of the new company for each share of Peerless common.

It was further agreed that the promoters would cause Atlas to underwrite 21,732 shares of the preferred stock and 32,198 shares of the common stock of the new company, and that the new company would have $300,000 of working capital. The stockholders agreed that upon the exchanges of stock all officers of Peerless and Union would resign, and other provisions were made as to details to close the transaction on October 7, 1930.

On the same date, October 7, 1930, J. Edgar Long, as majority stockholder of Union, party of the first part, and H. K. Seligman and W. E. Fletcher, as promoters, parties of the second part, entered into a written contract containing practically the same warranties and agreements as contained in that relative to Peerless. By this contract it appeared that Union had issued and outstanding 3,367½ shares of preferred stock of $100 par value and 4,044 shares of common stock of no par value, and that Long was the owner of 2,198 shares of the preferred stock and 2,824 shares of the common stock. It was agreed that the stockholder should deliver to the promoters his 2,824 shares of Union common in exchange for 8,500 shares of common stock of the new company, and $333,333.33⅓ in common stock of Atlas (par value $100 per share) at a price of $66.66⅔ per share, and $166,258.42 in preferred stock of Atlas at par.

It was also agreed that Long should deliver to the promoters 2,198 shares of preferred stock of Union in exchange for an equal amount of Atlas, preferred stock and 802 shares of the new company common.

The promoters also agreed to use their best efforts to cause the exchange of the remaining 1,169½ shares of Union preferred for $93,700 in cash, 232½ shares of Atlas preferred, and 585 shares of new company common, and that they would also use their best efforts to cause the exchange of the 1,220 outstanding minority shares of Union common on a basis of one share of Union for one of the new company common.

Long agreed to enter the employ of the new company, and not to engage in competitive business for 10 years.

On the same day, October 7, 1930, the promoters, H. K. Seligman, and W. E. Fletcher, and the new company entered into a written contract in which it was recited that the promoters owned or controlled substantially all of the outstanding capital stock of Peerless and Union, and desired to exchange same with the new company pursuant to a certain plan of reorganization, and it was agreed that the promoters should exchange their holdings in Peerless and Union as follows: 16,128 shares of Peerless preferred, 14,288 shares of Peerless common, 3,367½ shares of Union preferred, and 4,044 shares of Union common for $632,150 in cash, 6,318 shares of Atlas preferred at par, 8,712½ shares of Atlas common at a price of $66.66⅔

per share, and 32,145.79 shares of new company common. There were further agreements relative to the employment of stockholders in the old companies, and agreements to dissolve the old corporations, acquire their assets and assume their liabilities, and to reimburse stockholders for any income tax imposed upon them from the transaction. Also on October 7, 1930, separate agreements were entered into by petitioner, Eugene Frost and Edward R. Day with the new company and Atlas relative to the reimbursement of income tax imposed on the stockholders on account of the transfers.

Prior to October 7, 1930, the promoters had secured options on practically all of the minority stockholdings in Peerless and Union on the terms stated in the contracts above mentioned. These options were exercised through the First National Bank of Tamaqua, Pennsylvania, which delivered to Peerless minority stockholders $403,200 and 6,447.79 shares of new company common in exchange for 16,128 shares of Peerless preferred and 5,788 shares of Peerless common. Union minority stockholders received $103,950 and 2,096.50 shares of common stock of the new company for 937 shares of Union preferred and 1,128 shares of Union common.

All of the transfers and exchanges were made as indicated by the above agreements. The assets of the three old corporations, Peerless, Union and Black Diamond, were transferred to the new company and the old companies were dissolved.

Upon the completion of the stock exchanges on October 7, 1930, the shareholdings in the new company were as follows:

|  | Shares | Shares | Percentage of total |
|---|---|---|---|
| Preferred stock | 21,732 |  |  |
| Owned by Atlas |  | 21,732 | 100%. |
| Common stock | 64,252.54 |  |  |
| Owned by Atlas |  | 37,198 | 57% plus. |
| Owned by former stockholders of Peerless and Union |  | 27,054.54 | 43% minus. |

The question has been raised by the respondent as to the ownership of 5,000 shares of the new company common stock which were issued to Seligman and Fletcher, 2,500 shares to each. Under the agreement which had been entered into between Seligman and Fletcher as promoters and the majority stockholders of Peerless and of Union, only 27,054.54 common shares of the new company were to be issued to such majority stockholders. Atlas contemplated that approximately 65,000 common shares of the new company should be issued. At a meeting of the directors of Atlas on October 2, 1930, a resolution was passed providing in part:

FURTHER RESOLVED, that Atlas Powder Company, as the holder of all the stock of Peerless-Union Explosives Corporation, now outstanding, hereby consent to the issuance of Peerless-Union Explosives Corporation of said 21,732

shares of 6% Cumulative Preferred Stock and 32,198 shares of Common Stock, and further to the issuance by said Peerless-Union Explosives Corporation of such additional amount of its authorized Common Stock not exceeding, however, 5,500 shares to Harry K. Seligman and W. E. Fletcher, on account of such part of the purchase price payable to them in the course of the acquisition of the shares of Peerless Explosives Company, Black Diamond Power Company, and Union Explosives Company, as is payable in the stock of said Peerless-Union Explosives Corporation.

It is the uncontradicted testimony of Lyon, the president of the Atlas Powder Co., and of W. E. Fletcher, that the 5,000 shares of stock in question were issued to Seligman and Fletcher to be held by them subject to future directions from the officers of the Atlas Powder Co. The certificates in question were first turned over to the officers of Atlas and by such officers delivered to Seligman and Fletcher. The reason for the issuance of these shares to Seligman and Fletcher was for the purpose of making it appear that the Atlas Powder Co. was the stockholder of record of slightly less than a majority of the voting stock of the Peerless-Union Explosives Corporation. With respect to the certificate received by Fletcher he testified:

Mr. Lyon or one of the officers gave it to me and he told me that it was being given to me, and he said it was being given to Mr. Seligman, too, in order to reduce the amount of Atlas holdings in this company for sales reasons, and they expected us to hold it, to be used for the interest of Atlas in any way that they cared us to use it, and we were perfectly willing to do it.

Several months later Seligman and Fletcher were told by the officers of the Atlas Powder Co. that the Atlas Powder Co. released any claim which it might have to the 5,000 shares of stock in question.

From the above quoted evidence we find as a fact that the 5,000 shares of Peerless-Union Explosives Corporation standing in the name of Seligman and Fletcher were beneficially owned by the Atlas Powder Co. until the Atlas Powder Co. waived its claim with respect to those shares.

In exchange for his 2,534.38 shares of the common stock of Peerless the petitioner, on October 7, 1930, received $25,306.67 cash, 625 shares of preferred and 1,344 shares of common stock of Atlas and 2,720.08 shares of common stock of the new company, Peerless-Union Explosives Corporation.

It is the contention of the respondent in this proceeding that these transactions constituted a sale and not a reorganization through the exchange of stock and that there was no plan of reorganization. The evidence does not support the respondent's contention that there was no plan of reorganization. From its inception that plan was that the corporations, Peerless, Black Diamond and Union should be consolidated into a new corporation of which Atlas should own a controlling interest; that at least the majority stockholders of the

consolidating corporations should continue as stockholders of the new corporation to be formed. This plan was carried out. As said by the court in *Watts* v. *Commissioner*, 75 Fed. (2d) 981, " The plan of reorganization was the contract made and performed."

Section 112 of the Revenue Act of 1928 reads in part as follows:

RECOGNITION OF GAIN OR LOSS.

(a) *General rule.*—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) *Exchanges solely in kind.*—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) *Gain from exchanges not solely in kind.*—

(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place or organization, however effected.

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

At the consummation of the plan of reorganization, the new company, the Peerless-Union Explosives Corporation, was the owner of practically all of the stock and of all of the assets of the old corporations. This clearly establishes a reorganization and consolidation under section 112 (i) (1) (A) of the statute above quoted.

As to whether or not Atlas was a party to the reorganization, it may be said that the entire idea and plan of reorganization was

conceived by Atlas; that it was in the line of Atlas' business; and that its promotion and execution were entrusted to its agents, Seligman and Fletcher, under general instructions. The plan was developed and formed by Atlas and its agents; cash and its own stock necessary to the accomplishment of the transaction were furnished by Atlas; and it became the owner of the majority of the voting stock and of all of the preferred stock of the new company. In short, Atlas was the mainspring of the entire proceeding and without its participation there would have been no reorganization and consolidation into the new company.

The facts in this respect are quite similar to those in *Fifth Avenue Bank of New York, Executor*, 31 B. T. A. 945. We there held that the term "party to a reorganization" included other corporations than the one reorganized and that, where the corporation is so intimately connected with the reorganization of other corporations that the reorganization depends on its efforts or support, then such corporation is a party to the reorganization although it is not reorganized itself. The facts in this case are even stronger for the petitioner than those in the above cited case in support of the proposition that Atlas was a "party to a reorganization" for here the evidence shows that Atlas acquired all of the preferred stock of the new company and 57 percent of the common stock, which unquestionably made it a party to the reorganization. See also *Tulsa Oxygen Co.*, 18 B. T. A. 1283; *First National Bank of Champlain, New York*, 21 B. T. A. 415.

In his notice of deficiency the respondent increased the amount of cash received by the petitioner by $700. At the hearing it was admitted by the respondent that this was erroneous. The error will be corrected upon settlement under Rule 50 of the Board's rules of practice.

In the computation of the deficiency the respondent fixed the market value of Atlas preferred stock at $100 per share and of Atlas common stock at $66.66⅔ per share, being the value fixed by the parties in contracts of October 7, 1930. Petitioner contends that the fair market value of the common stock at the date of receipt by him, October 7, 1930, was only $64 per share, as shown by a sale of 100 shares of Atlas common on the New York Stock Exchange on that date. In view of the fact that the petitioner admits a taxable profit in 1930 equal to the full amount of cash received by him in 1930 from the transaction and of our conclusion that the shares of stock of Peerless-Union Explosives Corporation and of Atlas Powder Co. were received by him in a nontaxable exchange under section 112, it is not necessary to determine the fair market value of the Atlas stock on the date in question.

*Judgment will be entered under Rule 50.*